IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

THOMAS A. GREEN,            )   CIVIL ACTION NO. 9:14-4769-RBH-BM
                        )
                        )
           Plaintiff,     )
                        )
v.                    )   **REPORT AND RECOMMENDATION**
                        )
CAROLYN W. COLVIN,        )
Acting Commissioner of Social Security,  )
                        )
          Defendant.    )
_____)

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner wherein he was denied disability benefits.

This case was referred to the undersigned for a report and recommendation pursuant to Local Civil

Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) on July 20, 2011 (protective

filing date), alleging disability beginning February 10, 2011, due to vertigo and hearing loss believed

to be related to Ménière's disease (R.pp. 21, 80, 201, 240).[1]  Plaintiff's claim was denied both initially

and upon reconsideration.  Plaintiff then requested a hearing before an Administrative Law Judge

(ALJ), and hearings were held on December 5, 2012 and July 11, 2013.  (R.pp. 35-59, 60-79).  The

ALJ thereafter denied Plaintiff's claim in a decision issued July 31, 2013 (R.pp. 21-34). The Appeals

Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the

determination of the ALJ the final decision of the Commissioner.  (R.pp. 1-6).

_____

[1]Ménière's disease is defined as "hearing loss, tinnitus, and vertigo resulting from
nonsuppurative disease of the labyrinth with edema. [It is also called] *endolymphatic hydrops*,
*labyrinthine hydrops*, and *recurrent aural vertigo*."  <u>Dorland's Illustrated Medical Dictionary</u> 539
(32nd ed. 2012).



Plaintiff then filed this action in United States District Court.  Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for an award of benefits or, alternatively, reversed and remanded for further consideration.  The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980).  If the record contains substantial evidence to support the Commissioner's decision, it is the Court's duty to affirm the decision.  Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also, Hepp v. Astrue, 511 F.3d 798, 806 (8th cir. 2008)[Noting that the substantial evidence standard is "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner.  Laws, 368 F.2d at 642.  "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court



disagree with such decision as long as it is supported by 'substantial evidence.'"  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

### Discussion

A review of the record shows that Plaintiff, who was forty-six years old on the date he alleges he became disabled, has a high school education plus training from the United States Nuclear Power school, and past relevant work experience as a radiation monitor.  (R.pp. 28-29, 201, 241).  In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months.

After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[2] of Ménière's disease and hearing loss (R.p. 23), he nevertheless retained the residual functional capacity (RFC) to perform sedentary work[3] with limitations of working in a quiet environment; rarely bending (defined as 10% of the workday or less); no crawling, climbing, balancing, or crouching; no exposure to unprotected heights, vibration or dangerous machinery; and no jobs requiring the use of a telephone. (R.p. 24).  At step four, the

_____

[2]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities.  See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[3]Sedentary work is defined as lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. § 404.1567(a).



ALJ found that these limitations rendered Plaintiff unable to perform his past relevant work. (R.p. 28). However, the ALJ obtained testimony from a vocational expert ("VE") and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with these limitations, and that he was therefore not entitled to disability benefits during the period at issue. (R.pp. 29-30).

Plaintiff asserts that in reaching this decision, the ALJ erred because he failed to find that Plaintiff's Ménière's disease met or equaled the Listing of Impairments[4] at § 2.07; erred in discounting portions of the opinion of his treating physician, Dr. Russell Kitch; and erred in finding that Plaintiff's subjective testimony and allegations were not entirely credible. However, after careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d at 642 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

### Medical Records

Plaintiff's medical records show that he was seen and examined by Dr. Kitch, an otolaryngologist with Low Country ENT, on March 3, 2010, almost a year before he alleges his condition became disabling. Dr. Kitch found that Plaintiff had continued progression of sensorineural hearing loss on his most recent audiogram, with normal MRI and high resolution CT scan of his

---

[4]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). A claimant is presumed to be disabled if his or her impairment meets or is medically equivalent to the criteria of an impairment set forth in the Listings. See 20 C.F.R. § 416.925.



temporal bone.  Plaintiff had no significant balance complaints on this visit, but reported tinnitus bilaterally and hearing loss that caused him problems at work.  The impression was progressive binaural sensorineural hearing loss with moderate to severe impairment with the need for hearing aids to maintain adequate communication skills.  The plan was to repeat cochlear labs (which were last done in 2007).  (R.pp. 322, 342-343).

On September 22, 2010, Plaintiff told Dr. Kitch that he had had two episodes of vertigo about four months earlier, lasting four to eight hours.  Dr. Kitch noted that audiogram and tympanic studies earlier that month showed progressive moderately severe to profound bilateral sensory neural hearing loss (SNHL) with a progression from 50% impairment to a 59% impairment within six months.  Dr. Kitch thought that Plaintiff's decline in hearing correlated either with an upper respiratory infection and nose blowing or to pressure changes from driving through the mountains , and suspected that Plaintiff's progressive sensory neural loss might be being caused by membranous cochlearvestibulopathy, such as hydrops or Ménière's disease, versus perilymph fistula. He advised Plaintiff to avoid pressure change, valsalva, heavy lifting, added salt, caffeine, and nicotine, and to maintain a diet/dizziness diary.  (R.pp. 321, 340, 341).

In December 2010, Plaintiff reported to Dr. Kitch that he had increased dizziness, with discreet episodes of vertigo (lasting thirty minutes to several hours) occurring almost daily for the previous week, which began after bending and moving boxes, and with subsequent episodes occurring while he was sitting or lying still.  Plaintiff was advised to avoid heavy lifting, valsalva, or straining.  (R.p. 320).  The following month, on January 5, 2011 (one month before Plaintiff's alleged onset of disability),  treatment records from Julie Shoemaker, Au.D., also with Low Country ENT, reflect that Plaintiff had denied any recurrent episodes of vertigo.  Although an ECOG



(electrocochleography)[5] of Plaintiff's left ear was abnormal, ECOG waveforms were clear, and it was noted that Plaintiff's right ear was within normal limits. The remainder of the objective workup was negative. After Plaintiff's hearing aids were cleaned, he experienced high frequency gain increases in both ears. (R.p. 330). Thereafter, after maintaining a low salt, low caffeine diet and avoiding lifting, straining, and valsalva, Plaintiff reported to Dr. Kitch on January 11, 2011, that he had experienced no further vertigo over the previous six weeks. Dr. Kitch diagnosed Plaintiff with unspecified Ménière's disease, while noting that Plaintiff's abnormal ECOG studies suggested endlymphatic hydrops or other inner ear pathology such as fistula. (R.p. 318, see R.pp. 338, 339).

As previously noted, Plaintiff does not himself contend that his impairment was disabling during this period of time, or that his condition rendered him unable to work. See also (R.pp. 214, 230). Therefore, in order to obtain DIB, Plaintiff must have evidence to show that his condition significantly worsened after February 10, 2011 (his alleged disability onset date) from what it had been. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability].

Plaintiff's medical records reflect that on February 15, 2011 (five (5) days after Plaintiff alleges his condition became disabling), Plaintiff was seen by audiologist Shoemaker for a follow-up visit. Examination revealed that Plaintiff's external auditory canals were partially blocked due to cerumen. Audiogram results showed moderately severe to severe SNHL bilaterally, with Binaural impairment rated at 57.5%. (R.p. 329). Six days later, on February 21, 2011, Dr. Kitch

---

[5]Electrocochleography is the "measurement of electrical potentials (coclear microphonics, summating potentials, and action potentials of the eighth cranial nerve) in response to acoustic stimuli measures by an electrode in the external acoustic canal, on the tympanic membrane, or through the tympanic membrane applied to the promontory or the round window." Dorland's at 599.



completed a form for Metropolitan Life Insurance Company (MetLife) in which he advised MetLife that he had restricted Plaintiff from heavy lifting on September 22, 2010. He further wrote that his clinical findings were severe bilateral progressive SNHL and that his proposed treatment plan included hearing aids; avoidance of rapid pressure changes; and restrictions as to heavy lifting, bending, straining, valsalva, salt, caffeine, and nicotine (but that Plaintiff had been noncompliant with his dietary and lifting restrictions). Dr. Kitch opined that Plaintiff's condition restricted him to lifting/carrying/pushing/pulling no more than ten pounds, and that he was also restricted in his hearing ability. (R.p. 395-398).[6] The ALJ's RFC finding is not inconsistent with this opinion. (R.p. 24).

On March 8, 2011, Dr. Kitch wrote in a visit note that Plaintiff had been experiencing progressive sensorineural hearing loss and episodic vertigo since March 2006 (approximately five (5) years before he alleges his condition became disabling). Plaintiff told Dr. Kitch on this visit that he had had unpredictable disabling episodes of vertigo without significant warning, including two episodes within the past month (February 20 and March 3, 2011), with the later requiring Plaintiff's daughter to drive him home. However, it was noted that between such episodes Plaintiff's functioning was near normal. Dr. Kitch reported that his working diagnosis remained bilateral Ménière's disease, and that he anticipated Plaintiff's hearing loss to be permanent with possible progression. Even so, while at that time plaintiff's hearing loss was rated at 56%, with amplification his auditory thresholds were elevated to near normal. On Examination Plaintiff was noted to be

---

[6]This record was not before the ALJ, but was submitted by Plaintiff to the Appeals Council and included in the record. (See (R.pp. 1-2).



ambulatory without support, his speech was clear and articulate, his gait was unremarkable, and other examination and testing results were essentially normal. Dr. Kitch noted that:

> [a]t this point with amplification, hearing is adequate for [Plaintiff] to work in an office environment and communicate by telephone or optimally one-on-one conditions. Marginal discrimination ability leaves open the possibility for occasional misinterpretation, and this will be exacerbated by presence of background noise, outdoor situations with wind or heavy equipment, or crowds. The vertiginous episodes may continue to occur, or may resolve; however, this cannot be predicted. Until the episodes have been inactive for several months, the chances of an attack coming on without warning place him at risk of injury to himself or others in an industrial environment, working at heights or around heavy equipment, or driving.

(R.pp. 316- 317).

At a follow-up appointment in July 2011, Plaintiff complained about tinnitus, dizziness, and hearing loss (despite wearing two hearing aids), but nonetheless reported that his "last severe vertiginous episode [was] one month ago". Dr. Kitch's examination revealed "[h]earing acuity adequate for normal conversation in quiet room with hearing aids in place," and decreased mobility of Plaintiff's right tympanic membrane. An audiogram indicated moderately severe to severe bilateral SNHL, and Dr. Kitch opined that with Plaintiff's hearing loss in combination with his episodic balance disturbance, he continued to be disabled from his work at the weapons station. (R.pp. 314, 332-333).[7]

On October 7, 2011, state agency physician Dr. Angela Saito reviewed Plaintiff's medical records and opined that Plaintiff had no physical limitations other than bilateral hearing loss, as a result of which he should avoid a work environment with loud noises or background noise, and all exposure to vibration. While she gave Dr. Kitch's opinion that Plaintiff was unable to perform his former job great weight, she believed that Plaintiff's hearing impairment would not preclude him

---

[7]Plaintiff's job was rated as being "heavy" work, with a vocational profile of 6. (R.p. 28).



from performing many other types of work. (R.pp. 82-84). On December 8, 2011, a second state agency physician, Dr. Tom Brown, opined that Plaintiff had no postural or manipulative limitations, but that he should avoid a work environment with loud noises or background noise and all exposure to noise, vibration, and hazards. (R.pp. 91-93).

On January 5, 2012, Plaintiff reported to Dr. Kitch that he had had no vertigo for about four months after his previous visit, but that in late November and in December he had had frequent disabling vertiginous spells. An audiogram revealed a 62% impairment (increased from 60% impairment in July 2010) and diminished discrimination ability, "now down 30% on the left." Dr. Kitch's working diagnoses were bilateral endolymphatic hydrops versus internal fistula/patent vestibular aqueduct. Plaintiff also had external otitis. (R.pp. 346-349). Even so, during a followup visit for the right external otitis on January 19, 2012, Plaintiff reported no balance complaints.

On January 15, 2012, Dr. Kitch completed a "Disability Claim" form for MetLife[8] in which he stated that he had advised Plaintiff to cease performing his job at Bechtel Marine Propulsion on March 1, 2011, due to "progressive severe and profound hearing loss [and] episodic disabling vertigo" that imposed a risk of fall and injury and risk of miscommunication. He noted that he had been treating Plaintiff for his condition since 2006, that Plaintiff had not required hospitalization, and opined that Plaintiff could lift no more than ten pounds frequently; that he could sit for eight hours a day but would only intermittently be able to stand and/or walk; and that he should never climb, twist, bend, stoop, or operate a motor vehicle. (R.pp. 350-352).

On July 19, 2012, Dr. Kitch noted that Plaintiff's hearing had been subjectively stable since his last examination, and that Plaintiff reported he was only experiencing vertiginous episodes

---

[8]Plaintiff was receiving long term disability benefit payments from MetLife. See (R.p. 274).



about every two months which would last several hours, with the last episode having occurred on July 4, 2012 while he was driving. Plaintiff also complained of persistent sinus drainage and congestion and nocturnal snoring with possible apnea and mild morning hypersomnia. (R.pp. 381-382). Plaintiff thereafter underwent a sleep study in August 2012, which revealed moderately severe obstructive sleep apnea, but with possible underestimation of the severity of the sleep apnea based on the absence of supine positioning during the recording. (R.pp. 379- 380).

On August 19, 2012, Dr. Kitch responded by letter to a request from Plaintiff's attorney for information about Plaintiff's condition. Dr. Kitch advised Plaintiff's counsel that he had been seeing Plaintiff for bilateral sudden SNHL and vertigo about every six months since August 1, 2006. He wrote that Plaintiff would experience disabling vertiginous episodes every several months to every several weeks; that recent diagnoses of obstructive sleep apnea and chronic rhinosinusistis might indirectly affect Plaintiff's hearing and balance symptoms; and that despite treatment options (which were limited), Plaintiff had progression of his hearing loss with current auditory testing indicating a 62% impairment. He also opined that Plaintiff had marginal speech discrimination ability that severely limited the effectiveness of hearing aids. Dr. Kitch further wrote that:

> using hearing aids with significant background noise further diminishes speech recognition ability. This leaves [Plaintiff] with a higher likelihood of misinterpretation that would be a risk in any type of industrial setting or position where accurate communication is needed...Bending over or straining, or rapid head movements, or working with a moving visual surround place him at significant risk for losing his balance or falling...

Dr. Kitch opined that these functional limitations were "reasonably consistent with objective medical evidence", and that he had no reason to believe that Plaintiff exaggerated or misstated symptoms "based on fairly reliable responses to audiometric and balance testing, physical examinations" and



what Dr. Kitch believed was Plaintiff's "genuine expression of desire to return to work." Dr. Kitch wrote that "[t]here is no question that [Plaintiff's] hearing impairment limits his ability to work and communicate in an environment with background noise, secondary to his significant hearing loss and poor speech discrimination ability", and that Plaintiff had not been able to sustain work at any greater level of exertion or skill [than this level] since March 8, 2011. (R.pp. 371-372).

In a letter dated December 7, 2012, Plaintiff's council asked Dr. Kitch to provide information on whether Plaintiff met the criteria for Listing 2.07; if Plaintiff's statement concerning dizziness following quick head turning, bending over, and/or transferring his gaze from desk to computer could result in vertinginous episodes; and if Plaintiff was able to sustain sedentary work in a relatively quiet environment on a regular and continuing basis. (R.pp. 393-394). In response, Dr. Kitch wrote on December 27, 2012, that Plaintiff had continued to complain of episodic, disabling vertiginous spells occurring approximately every two months, but opined that while testing since Plaintiff's alleged onset date confirmed he met part B (hearing loss) of Listing 2.07, he had not re-demonstrated part A (disturbed function of vestibular labyrinth) of that listing. He also noted that a test conducted on January 5, 2011, revealed an abnormal ECOG, but that Plaintiff had not had any additional vestibular testing performed since that date. Dr. Kitch stated that symptoms of dizziness, instability provoked by rapid head movement, or transferring gaze from the desk to the computer screen were common in patients with Plaintiff's impairment. As to Plaintiff's ability to perform work-related activities, Dr. Kitch opined that Plaintiff

> should continue to be able to sustain sedentary office-based work in a relatively quiet environment on a regular and continuing basis: i.e. 8 hours per day, 5 days per week. My opinion regarding workplace limitations with respect to background noise,



working heights or around heavy machinery was outlined in my letter August 19, 2012 and has not changed.

(R.pp. 391-392).

On January 31, 2013, audiologist Shoemaker noted that caloric testing was within normal limits and that Plaintiff's ABR testing was consistent with moderately severe to profound hearing loss in his left ear and a severe to profound hearing loss in his right ear. She wrote that these results were "most consistent" with those obtained on March 8, 2011. (R.pp. 400-408).[9]

Finally, apparently in response to another request from Plaintiff's counsel, Dr. Kitch provided another letter on February 5, 2013, in which he wrote that the results of Plaintiff's audiometric testing in January 2013 represented reliable and accurate assessments of hearing acuity which cannot be manipulated voluntarily by the patient, and that these findings were consistent with Plaintiff's previous audiograms obtained in 2011 and 2012. He stated that Plaintiff's VNG (video-nystagmography) results were normal, "which in connection with abnormal ECOG is consistent with the impaired vestibular function secondary to endolymphatic hydrops or [Ménière's] Disease." Contrary to his previous opinion, however, Dr. Kitch now opined that Plaintiff's condition met the criteria for Listing 2.07, with both parts A and B of this listing being "confirmed by these current results." (R.p. 390). Dr. Kitch further stated:

> The patient testified that the last year of employment he was placed on limited duty in an office setting, but continued to experience episodes of vertigo precipitated by activities such as bending over, moving his head quickly or transferring his gaze from the desk to the computer screen. The statements are consistent with objective evidence, including physical examinations by me from 2006 to the present, and sequential audiometric and vestibular testing performed at Lowcountry ENT by our senior audiologist, Dr. Julie Shoemaker. [Plaintiff] and most patients who have

---

[9]These January 31, 2013 test results were not before the ALJ, but were submitted to the Appeals Council and admitted into the record.



[Ménière's] Disease will experience significant instability with movement or change in the visual field secondary to visual (rather than vestibular) dependence for maintenance of balance - caused by an intermittent unpredictable disruption of the vestibular input to the brain.

(R.pp. 390-391).

## I.

## (Listing 2.07A)

In asserting error in this case, Plaintiff initially argues that the ALJ erred in finding that he did not meet or equal[10] Listing 2.07, which requires:

Disturbance of labyrinthine-vestibular function (including Ménière's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:

A. Disturbed function of vestibular labyrinth[11] demonstrated by caloric or other vestibular tests; and

B. Hearing loss established by audiometry.

20 C.F.R. pt. 404, subpt. P, app. 1, § 2.07. The parties appear to agree that Plaintiff meets part B of this Listing, but disagree as to whether Plaintiff meets or equals part A of the Listing as well as the introductory paragraph requirement of frequent attacks of balance disturbance. See Sullivan v. Zebley, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."].

---

[10]If a claimant has an impairment described in a Listing, but does not exhibit one or more of the findings specified in that listing (or exhibits all of the findings, but one or more of the findings is not as severe as specified), the claimant's impairment will be found to be "medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria." 20 CFR § 404.1526(b)(1).

[11]The portion of the membranous labyrinth concerned with the sense of equilibration.

13



Plaintiff argues that his abnormal ECOG testing in January 2011 and Dr. Kitch's February 2013 opinion show that his condition meets or equals part A of Listing 2.07. However, the ALJ found that Plaintiff did not meet or equal part A of this Listing because the evidence did not show Plaintiff had a history of "frequent attacks of balance disturbance, tinnitus and progressive loss of hearing with disturbed function of vestibular labryinth demonstrated by caloric or other vestibular tests, as required by Listing 2.07A." (R.p. 24). The ALJ acknowledged that Dr. Kitch had opined that an abnormal ECOG performed on January 5, 2011 objectively demonstrated disturbed labyrinth and vestibular function, but correctly found that there had been no additional vestibular testing performed since Plaintiff's alleged disability onset date, and that aside from Plaintiff's abnormal January 2011 ECOG,[12] there were no clinical studies documenting Plaintiff's impaired vestibular function. (R.p. 26). Indeed, in December 2012, Dr. Kitch had specifically opined that Plaintiff's abnormal ECOG on January 5, 2011 did *not* show that he met Listing 2.07A because Plaintiff had "not redemonstrated part A (disturbed function of vestibular labyrinth)" since that time. (R.p. 391).[13]

Further, the January 2013 notes from audiologist Shoemaker, which were submitted to the Appeals Council, showed that Plaintiff's caloric testing, including video electronystagmography (VNG), were within normal limits (R.p. 400), while neurological examinations in March 2011, July 2011, January 2012, and July 2012 were unremarkable and Plaintiff's medical records showed that he was able to ambulate without support, his cranial nerves

---

[12]There is also no indication that ECOG testing is the preferred measure of vestibular dysfunction, as the Listings provide that vestibular functions are "assessed by positional and caloric testing, preferably by electronystagmography." 20 C.F.R. pt. 404, subpt P, app. 1, § 2.00(C)(3).

[13]The ALJ noted in his decision that Dr. Kitch's subsequent February 2013 opinion (R.p. 390) relied on this same January 2011 testing. (R.p. 28).



were intact and symmetrical, and he had a normal gait. (R.pp. 314, 316, 346, 387). As such, there is substantial evidence in the case record to support the ALJ's conclusion that Plaintiff did not meet the requirements of Listing 2.07A. (R.p. 24); see Laws, 368 F.2d at 642 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"]; Meyer v. Astrue, 662 F.3d 700, 707 (4th Cir. 2011)["Assessing the probative value of competing evidence is quintessentially the role of the fact finder"]; see also Hepp, 511 F.3d at 806 [Noting that the substantial evidence standard requires even less that a preponderance of the evidence]; Thomas v. Celebreeze, 331 F.2d 541, 543 (4th Cir. 1964) [court scrutinizes the record as a whole to determine whether the conclusions reached are rational].

Additionally, even if Plaintiff had been able to show that he met or equaled part A of Listing 2.07, the ALJ also determined that he had failed to demonstrate "a history of frequent attacks of balance disturbance;" 20 C.F.R. pt. 404, subpt P, app. 1, § 2.07; with corresponding "detailed description of the vertiginous episodes, including notation of frequency, severity, and duration of the attacks." 20 C.F.R. pt. 404, subpt P, app. 1, § 2.00(C)(3). (R.p. 24). Again, the record contains substantial evidence to support this finding. In addressing the frequency requirement, the ALJ specifically referred to Listing 2.00(C)(3) and noted that Plaintiff's treatment notes "generally document that the claimant's vertigo episodes have occurred once every two months since his alleged onset date", which he found did not meet the frequency requirement of Listing 2.07. (R.p. 24). Although the term "frequent" is not defined in the Listing, the ALJ properly considered the entire record in determining that Plaintiff did not meet this requirement. Specifically, on January 11, 2011, Plaintiff reported he had had no vertiginous episodes in the prior six weeks (R.p. 318); in March 2011 (shortly after Plaintiff's alleged onset date), Plaintiff reported only two episodes of vertigo occurring



15

in the month prior to the visit, with "near normal" balance function in the intervals between the alleged episodes (R.p. 316); in July 2011, Plaintiff reported to Dr. Kitch that his last significant vertiginous episode had occurred approximately one month prior to the visit (R.p. 314); on January 5, 2012, Plaintiff reported that although he had had disabling vertiginous spells in late November and December 2011, he had had no episodes of vertigo during the *four months* following his July 2011 visit (R.p. 346); that after being treated for external otitis diagnosed at the January 5, 2012 appointment, Plaintiff reported no balance complaints at a follow up appointment on January 19, 2012 (R.p. 345); and in July 2012, Plaintiff reported that he had only experienced vertiginous episodes approximately once every two months (R.p. 381). Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985) ["Decision of ALJ should be upheld when it is sufficient to "assure [the Court] that she considered the important evidence . . . [and to enable the Court] to trace the path of her reasoning"]; Lyall v. Chater, No. 94-2395, 1995 WL 417654 at * 1 (4th Cir. 1995)[Finding no error where the ALJ's analysis "was sufficiently comprehensive as to permit appellate review"].

The ALJ also later noted in his decision that the medical record was "devoid of any evidence showing the claimant subsequently sought treatment for vertiginous episodes after December 2012, suggesting [the episodes] improved or [did] not occur with the frequency alleged." (R.p. 26). A finding that these attacks were not of the frequency required is also supported by Dr. Kitch's December 2012 opinion that Plaintiff could sustain sedentary office based work in a relatively quiet environment on a regular and continued basis (8 hours per day, 5 days per week) with limitations as to background noise, heights, and heavy machinery. (R.p. 391). As for Dr. Kitch's February 2013 opinion, the ALJ discounted that opinion, noting that it was based on the same records and evidence as Dr. Kitch's previous opinions, and that Plaintiff's "treatment notes do not indicate



that [his] vertiginous episodes occurred with the frequency required by Section 2.00".  (R.pp. 28).

Again, the undersigned can discern no reversible error in this finding.  Hays, 907 F.2d at 1456 [it is

the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; see also

Poling v. Halter, No. 00-40, 2001 WL 34630642, at * 7 (N.D.W.Va. Mar. 29, 2001) ["It is the duty

of the ALJ, rather than the reviewing court, to assess the evidence of record and draw inferences

therefrom"].

        Finally, the ALJ also gave "some weight" to the opinions of the state agency

physicians (both of whom opined that Plaintiff did not meet a Listing), even while imposing some

additional exertional and postural limitations to account for Plaintiff's reports of vertigo.  (R.p. 28).

Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) [Opinion of non-examining physicians can

constitute substantial evidence to support the decision of the Commissioner].  Plaintiff admits that

the state agency physicians opined that his impairments did not meet or equal the requirements of

Listing 2.07 (Plaintiff's Brief, ECF No. 12 at 24) in October and December 2011,[14] but argues that

the ALJ should have obtained an updated expert medical opinion based on Dr. Kitch's opinions

rendered after that time, citing to SSR 96-6p, which provides:

> When an administrative law judge or the Appeals Council finds that an individual[']s
> impairment(s) is not equivalent in severity to any listing, the requirement to receive
> expert opinion evidence into the record may be satisfied by any of the foregoing
> documents signed by a State agency medical or psychological consultant. However,
> an administrative law judge and the Appeals Council must obtain an updated medical
> opinion from a medical expert in the following circumstances:

---

[14]Dr. Saito and Dr. Brown also signed disability determination and transmittal forms
indicating that body system "02" and "hearing loss" had been considered. (R.p. 87, 96). The findings
of a state-agency medical reviewer recorded on a Disability Determination and Transmittal form
"ensures that consideration by a physician (or psychologist) designated by the Commissioner has been
given to the question of medical equivalence at the initial and reconsideration levels of administrative
review."  SSR 96-6p.



***

> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

SSR 96-6p, 1996 WL 374180, at *4-*5 (July 2, 1996).

However, all of Dr. Kitch's opinions (other than his February 2013 opinion) fail to contradict a finding that Plaintiff did not meet or equal Listing 2.07, with his December 2012 opinion even specifically noting that Plaintiff did *not* meet or equal Listing 2.07. Since the ALJ discounted Dr. Kitch's February 2013 opinion, specifically Dr. Kitch's opinion that Plaintiff met Listing 2.07, there was no finding by the ALJ that Dr. Kitch's later opinions might change the state agency medical consultant's findings concerning Listing 2.07.

Plaintiff further argues that the state agency medical consultants opinions do not provide substantial evidence to support the ALJ's step three determination because the ALJ only gave those opinions some weight. However, the ALJ only gave these opinions some weight because, apparently giving Plaintiff every benefit of the doubt, he imposed some additional exertional and postural limitations to account for Plaintiff's reports of vertigo. (R.p. 28). There is no error indicated by this decision. Meyer, 662 F.3d at 707 ["Assessing the probative value of competing evidence is quintessentially the role of the fact finder"]; see also Marquez v. Astrue, No. 08-206, 2009 WL 3063106 at * 4 (C.D.Cal. Sept. 21, 2006)[No error where ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State Agency examiner]; cf. Muir v. Astrue, No. 07-727, 2009 WL 799459, at * 6 (M.D.Fla. Mar. 24, 2009)[No error where ALJ gave Plaintiff even a more restrictive RFC than the medical records provided].



In sum, the ALJ found that Plaintiff's impairments did not meet or equal the severity of a listed impairment, including Listing 2.07; (R.pp. 23-24); and the undersigned can find no reversible error in this conclusion.  See Sullivan, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."]; Blalock, 483 F.2d at 775 [it is the claimant who bears the burden of proving her disability]; see also Hays, 907 F.2d at 1456 [it is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence].  Hence, no error is presented in the ALJ's consideration of Plaintiff's impairments in conjunction with the Listings.  Cf. Shelton ex rel. Brownless v. Barnhart, 24 F. App'x 623, at ** 2 (8th Cir. 2001)[upholding ALJ's finding that Plaintiff was not functionally equal to a listed disability]; see Hays, 907 F.2d at 1456 [If there is evidence to justify refusal to direct a verdict where the case before a jury, then there is 'substantial evidence']; see also Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

## II.

### (Treating Physician)

Plaintiff also alleges that the ALJ erred in giving great weight to only select parts of treating physician Dr. Kitch's opinions, while disregarding other parts of Dr. Kitch's opinions for (Plaintiff contends) unsupported reasons.  Plaintiff is correct that the opinions of treating physicians are normally accorded significant weight; see Craig v. Chater, 76 F.3d 589-590 (4th Cir. 1996) [Noting importance of treating physician opinion]; and the ALJ here did give "great weight" to many of Dr. Kitch's opinions.  However, he did not do so in all respects, specifically giving little



evidentiary weight to Dr. Kitch's opinions where they were not supported by his own treatment notes or the other evidentiary record; Craig, 76 F.3d at 589-590 [rejection of treating physician's opinion of disability justified where the treating physician's opinion was inconsistent with substantial evidence of record]; and after a careful review of the record and decision in this case, the undersigned can find no reversible error in the ALJ's treatment of Dr. Kitch's opinions. Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) ["[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (citations omitted) ]; see also Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence].

As noted, the ALJ gave great weight to most of Kitch's opinions as expressed throughout the medical record. The ALJ gave great weight to the March 2011 opinion of Dr. Kitch that Plaintiff should avoid working at heights or around heavy equipment secondary to his reports of vertigo (R.p. 27), and as a result included in Plaintiff's RFC that Plaintiff could not climb and could not have exposure to unprotected heights or dangerous machinery (R.p. 24). The ALJ also gave great weight to Dr. Kitch's July 2011 opinion that Plaintiff was fully disabled as to his current work at the weapons station (R.p. 27), and found that Plaintiff could not perform this past relevant work (R.p. 28). The ALJ gave great weight to Dr. Kitch's January 2012 opinion that Plaintiff could sit for eight hours in an eight-hour day, lift up to ten pounds frequently, and could not climb, or twist/bend/stoop (R.p. 27), as well as to Dr. Kitch's August 2012 letter that Plaintiff was not able to perform his past relevant work and that Plaintiff had work restrictions of a quiet environment without significant background noise and had to avoid work at heights or around dangerous machinery. The ALJ also gave great weight to Dr. Kitch's opinion that bending over and straining, or rapid head movement



might cause Plaintiff to lose balance, and included RFC restrictions that Plaintiff could rarely bend and could not crawl, balance, or crouch. (R.p. 24). The ALJ further gave great weight to Dr. Kitch's December 2012 opinion that Plaintiff should be able to sustain sedentary work in a relatively quiet environment on a regular and continuing basis with workplace restrictions of working in an environment without significant background noise and avoiding heights and heavy machinery, finding that these restrictions were supported by the objective evidence of record. (R.p. 28).

However, while giving great weight to Dr. Kitch's opinion that Plaintiff could no longer perform his past relevant work, the ALJ found that to the extent Dr. Kitch intended to opine that Plaintiff could not perform all work, that opinion was entitled to little weight as it was not supported by the other evidence of record. The ALJ also properly discounted Dr. Kitch's opinion to the extent that it was an opinion that Plaintiff could not perform any work activity, in part, because a determination of whether an individual is "disabled" or "unable to work" is a decision reserved to the Commissioner. (R.p. 27). See Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) [physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"]; 20 C.F.R. § 404.1527(d)[" A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled."].

Additionally, the ALJ discounted some of Dr. Kitch's opinions because they were contradicted by his treatment notes or other evidence. The ALJ gave little weight to Dr. Kitch's opinion that Plaintiff should avoid all driving based on Plaintiff's own testimony that he drives. (R.p. 27). Although Plaintiff appears to argue that this finding was error because Plaintiff testified that he only drove short distances; (R.pp. 52-53, 55); the ALJ clearly considered Plaintiff's testimony in his



decision, specifically noting Plaintiff's testimony that he drove every week on a rather infrequent basis (generally to the church and grocery store, each approximately one mile from his house) and did not drive if he felt slightly off-balance. (R.pp. 25, 27).[15]  The ALJ also gave little weight to Dr. Kitch's July 2012 opinion that Plaintiff was unable to perform normal activities of daily living and would miss days of work secondary to vertigo because Dr. Kitch failed to sign the document, Dr. Kitch indicated that his statements were based on Plaintiff's subjective reports,[16] Dr. Kitch did not indicate that he shared Plaintiff's opinions regarding Plaintiff's alleged inability to perform normal activities and absences, and Dr. Kitch did not document any objective neurological deficits or balance problems at that time.   (R.p. 387).   Further, the ALJ discounted this opinion because it was inconsistent with Dr. Kitch's December 2012 opinion that Plaintiff could perform a reduced range of sedentary work. (R.p. 27).  See (R.pp. 391-392).  Finally, as discussed above, the ALJ discounted Dr. Kitch's February 2013 opinion that Plaintiff met Listing 2.07 because treatment notes did not show that Plaintiff's vertiginous episodes occurred with the frequency required by Section 2.00 and Dr. Kitch did not set forth any specific work restrictions to supplement his prior opinion in December 2012 that Plaintiff could perform a restricted range of sedentary work.  (R.p. 28).  Burch v. Apfel, 9 F. App'x 255 (4th Cir. 2001)[ALJ did not err in giving physician's opinion little weight where the physician's opinion was not consistent with her own progress notes.].

Plaintiff contends that the ALJ failed to address Dr. Kitch's notations that Plaintiff continued to experience episodic disabling vertigo in March 2011, January 2012, July 2012, and

---

[15]Dr. Kitch's February 21, 2011 opinion (R.pp. 395-398) was not before the ALJ.  However, the ALJ RFC restrictions appear to be similar to those in Dr. Kitch's other opinions.

[16]This report actually appears to indicate that the restrictions in daily activities listed are what Plaintiff himself reported; not findings of Dr. Kitch.  (R.p. 387).



August 2012; Dr. Kitch's notation in July 2011 that Plaintiff could no longer perform his past work due to bilateral hearing impairment and episodic balance disturbance; and Dr. Kitch's December 2012 opinion that while Plaintiff could sustain sedentary exertional activity, he would be subject to additional limitations imposed by symptoms of dizziness. However, substantial evidence supports the weight given by the ALJ to Dr. Kitch's opinions because, although there are a few occasions when vertiginous episodes were reported as occurring more often, the treatment notes generally evidence vertiginous episodes occurring approximately every two months (R.pp. 24-26, 84, 93, 314, 316, 318, 345-346, 381). Further, treatment notes documenting Plaintiff's own allegations do not constitute medical findings because a physician's notation of a claimant's subjective complaints does not transform these subjective complaints into objective medical findings. See Craig, 76 F.3d at 590, n. 2 [holding that a medical source does not transform the claimant's subjective complaints into objective findings simply by recording them in his narrative report]; see also Morris v. Barnhart, No. 03–1332, 2003 WL 22436040, at *4 (3d Cir. Oct.28, 2003) ["the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion."].

Concededly, Plaintiff's medical records also reflect that Plaintiff consistently complained of limitations caused by his condition, as well as that Plaintiff does suffer from Ménière's disease and hearing loss. That does not, however, mean that Plaintiff is totally disabled from all work activity or that he is entitled to disability benefits. The ALJ's job is to evaluate *all* of the evidence, and then make a fact finding as to a claimant's RFC based on that evidence. See Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994)[In assessing the credibility of the severity

23



of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]. That is exactly what the ALJ did here; he evaluated the evidence of record and determined that Plaintiff's impairments, although severe, did not prevent him from performing sedentary work with certain limitations designed to account for the effects of his medical impairments as shown and documented in the record. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) ["...What we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"]. This Court cannot substitute its own judgment for that of the ALJ just because there may be conflicting evidence. See Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) ["In reviewing for substantial evidence, we do not undertake to itself reweigh conflicting evidence."]; Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001)[holding that the court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency]; Kellough v. Heckler, 785 F.2d 1147, 1149 (4th Cir. 1986) ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)].

The ALJ properly considered and analyzed Dr. Kitch's opinion in conjunction with the evidence as a whole, and the decision does not reflect a failure by the ALJ to properly consider his opinion or the record and evidence in this case. Krogmeier, 294 F.3d at 1023 ["[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight" (citations omitted) ]; Bowen, 482 U.S. at 146, n. 5 [Plaintiff has the burden to show that he has a disabling impairment]; see also Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D.Ohio Nov. 15, 2011), adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012)[Even where

24



substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."]. Therefore, Plaintiff's argument that the decision in this case should be reversed due to an improper evaluation of Dr. Kitch's opinion is without merit.  Smith, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

### III.

### (Credibility)

Plaintiff's final claim of error is that the ALJ's credibility findings are undermined by the ALJ's selective citation of evidence from the record and are contrary to the ALJ's determination that Dr. Kitch's opinions are supported by objective medical evidence.  However, the ALJ's determination that Plaintiff's claims of debilitating symptoms were not credible is supported by substantial evidence.

The ALJ discounted Plaintiff's credibility in part based on his relatively benign objective examinations, including neurological examinations in March 2011, July 2011, January 2012, and July 2012 that revealed unremarkable findings, and that Plaintiff was ambulatory without support and had normal gait and posture (R.pp. 314, 316, 346, 381); that Dr. Kitch had opined in January 2012 that Plaintiff was able to sit for eight hours during an eight-hour workday and frequently lift up to ten pounds (R.p. 351); that in July 2012, Plaintiff's hearing loss was noted to be stable since his last examination and his hearing aids were working well (R.p. 391); that Dr. Kitch had opined in December 2012 that Plaintiff was capable of performing sedentary office-based work in a relatively quiet environment on a regular and continuing basis (R.p. 381); and that the state agency physicians had opined that Plaintiff had no exertional, postural, manipulative, or visual limitations, and could



work in jobs that did not have loud sound or background noise or require exposure to vibration, heights, and heavy machinery. (R.pp. 25-26, 28).

While the ALJ did find that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, he found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible based on the entire record, including both the subjective and objective evidence. (R.pp. 26-27 ). There is no error shown in this finding. See SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) [Where a claimant seeks to rely on subjective evidence to prove the severity of her symptoms, the ALJ "must make a finding on the credibility of the individual's statements, based on a consideration of the entire case record."]; Mickles, 29 F.3d at 925-926 [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]. When objective evidence conflicts with a claimant's subjective statements, an ALJ is allowed to give the statements less weight. See SSR 96–7p, 1996 WL 374186, at *1; Craig v. Chater, 76 F.3d at 595 ["Although a claimant's allegations . . . may not be discredited solely because they are not substantiated by objective evidence of . . . its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment."].

In this case, the ALJ specifically set out the two-step process for evaluating credibility (R.p. 25), and discussed Plaintiff's testimony and the medical record in addressing both the objective and subjective evidence (see R.pp. 25-28). The ALJ also properly considered inconsistencies between Plaintiff's testimony and other evidence of record in evaluating the credibility of Plaintiff's subjective complaints. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) [ALJ may properly



consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints]. He noted that although Plaintiff testified that the frequency of his vertigo episodes had increased since he stopped working, in letters dated July and December 2012, Dr. Kitch noted that Plaintiff only complained of episodic vertiginous spells occurring approximately every two months, with the record containing no evidence that Plaintiff sought treatment for vertiginous episodes after December 2012. The ALJ also noted that the audiologist found that, with amplification, Plaintiff's hearing was adequate for work in an office environment and to communicate by telephone or optimally in one-on one conditions, and that Plaintiff conversed effectively and normally at the hearing and did not demonstrate any significant difficulty hearing or communicating. (R.p. 26). See Ables v. Astrue, No. 10-3203, 2012 WL 967355 at *11 (D.S.C. Mar. 21, 2012) ["Factors in evaluating the claimant's statements include consistency in the claimant's statements, medical evidence, medical treatment history, and the adjudicator's observations of the claimant," citing to SSR 96-7p.].

After a review of the record and evidence in this case, the court can find no reversible error in the ALJ's treatment of the subjective testimony given by the Plaintiff. See 20 C.F.R. § 404.1529(c) [ALJ must consider objective medical evidence]; Parris v. Heckler, 733 F.2d 324, 327 (4th Cir. 1984) ["[S]ubjective evidence . . . cannot take precedence over objective medical evidence or the lack thereof." (citation omitted)]. Therefore, this argument is without merit.

### Conclusion

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984). As previously noted, if the record contains substantial evidence to support the decision



(i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be affirmed.

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

December 15, 2015
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satis`fy itself that there is no clear error on the face of the record in order to accept the recommendation.'" <u>Diamond v. Colonial Life & Acc. Ins. Co.</u>, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); <u>see</u> Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

